FIRST STATE BANK OF MILFORD *v*. WALLACE.

FRAUDULENT CONVEYANCES—HUSBAND AND WIFE—ESTATES BY ENTIRETIES.

Where a husband and wife owning a farm by the entireties exchanged it for two houses and lots in a city, taking title by the entireties, and paying in cash a difference of $4,100, the husband at the same time disposing of his personalty, on a bill filed in aid of execution by creditors of the husband on indebtedness owing at the time the exchange was made, *held*, that to the extent of one-half the cash payment the transaction was in fraud of creditors, and the houses should be subject to their claim to that amount. OSTRANDER, C. J., dissenting.

Appeal from Washtenaw; Kinne, J. Submitted April 5, 1918. (Docket No. 46.) Decided June 3, 1918.

Bill in aid of execution by the First State Bank of Milford against Alexander Wallace and another. From a decree for plaintiff, defendants appeal. Modified and affirmed.

*Cavanaugh & Burke*, for plaintiff.

*James H. Pound*, for defendants.

KUHN, J. The defendant, Alexander Wallace, and one of his sisters were given by their father's will a certain farm property of about 95 acres in Livingston county, charged, however, with the payment of certain debts, funeral expenses and the cost of erecting a monument on the cemetery lot. Mr. Wallace purchased his sister's half interest for $2,500, which he borrowed from his brother, Henry M. Wallace, on the security of a mortgage on the property. In addition to this 95 acres Mr. Wallace owned some adjoining land, making altogether a farm of about 246 acres, of

which, however, more than 70 acres was covered with water, being a part of Dunham (or Andrews) Lake. In the early part of 1909 Mr. Wallace, then 46 years of age and unmarried, made a proposal to a Miss Lena C. Rohn, of Brighton, then about 33, that if she would marry him and assist him in paying off the indebtedness on the farm, he would fix the property so that when he was through with it, it would be hers. After consideration, she accepted his offer and they were married. She had a little property of her own—a small amount of money, some poultry and a Jersey cow—and when she came to the farm, carried on a dairy and poultry business, and, according to Mr. Wallace's statement, did more than half the work in paying off the indebtedness on the farm. Their efforts to that end were successful, and on December 28, 1910, he fulfilled his antenuptial promise by changing the title of the farm into an estate by the entirety. This was accomplished by conveying the farm property to Amelia Rohn (Mrs. Wallace's mother) and on the same day taking back from her a deed of the same land, running to Alexander and Lena C. Wallace. Each deed mentioned and included the personal property on the farm, teams, harnesses, live stock, farm utensils, hay, grain, farm produce, household furniture, wagons, buggies, sleighs, cutter, robes, blanket, lumber, logs and wood. The mortgage of $2,500 was paid, and was discharged of record on August 29, 1912. All of his indebtedness had been paid.

On June 24, 1915, Mr. Wallace borrowed $225 from the plaintiff, the First State Bank of Milford, on his unsecured note. The money, according to his testimony, went to an automobile agent, with whom he was making a trade in automobiles. On July 15, 1915, he indorsed a note made by one, Seely Orr, for $100, on which the plaintiff loaned that amount without security. On July 30, 1915, Mr. Wallace borrowed $30

from the plaintiff bank on another unsecured note. At this time Mr. Wallace's health was failing and he was becoming blind. It seemed advisable, therefore, to dispose of the farm property, and while Mr. and Mrs. Wallace were considering the matter, an advertisement in an Ann Arbor newspaper came to their attention, in which one George Gallup offered for sale some residence properties in Ann Arbor and stated that he would take certain bonds and stock in payment. With the thought in mind that a good house in Ann Arbor would furnish a source of income for Mrs. Wallace through renting rooms to students, they replied to this advertisement, and correspondence and negotiations followed. They sought the advice of Henry M. Wallace. He was acquainted with Mr. Gallup and conducted the negotiations on behalf of his brother, which finally resulted in the following transaction: Alexander Wallace and wife deeded the farm property to George Gallup, at a valuation of $7,900, and paid him $4,100 in cash, in return for which George Gallup and wife deeded to Alexander Wallace and Lena C. Wallace, as husband and wife, two residence properties in Ann Arbor, one known as No. 307 North State street, at a valuation of $5,000, and the other No. 1513 South University avenue, at a valuation of $7,000. The growing crops on the farm were thrown in with it without any further consideration. In connection with this exchange, Mr. and Mrs. Wallace also turned over to Mr. Gallup the live stock, farm tools and implements, an automobile, a chattel mortgage and a number of notes, at a valuation of $3,500, in return for which Mr. Gallup transferred to Alexander Wallace 400 shares of the capital stock of the Consolidated Gas, Electric & Water Company, at the same valuation. It appears that the stock of this company was without any value, as the constituent companies went into the hands of receivers. The testimony indicates

that the transaction was not viewed as one exchange with the consideration on each side estimated as a whole, but that the real estate properties on each side were set off against each other and the difference paid in cash, and that the stock was applied specifically to the purchase of the personal property. Mr. Alexander Wallace testified on cross-examination:

"*Q.* * * * You turned over all that property for this property in Ann Arbor, is that right?

"*A.* No, the personal property was turned in for that stock.

"*Q.* And the farm was turned in for the property here in Ann Arbor?

"*A.* Yes."

The $4,100 cash paid over in the transaction was borrowed by Mr. and Mrs. Wallace from Henry M. Wallace; $2,400 of this was paid by a five-year lease of No. 307 North State street, given by Alexander and Lena Wallace to Henry M. Wallace, payment of rent for the full term being credited in advance. The remaining $1,700 was to be secured by a mortgage on the same property, which, however, at the time of hearing had not been given, owing to this litigation.

The notes given to the plaintiff bank were not paid, and the bank brought suit against Alexander Wallace and took judgment by default for $372.46 damages and $27.60 costs, on which a writ of execution was issued and levied on the two pieces of real estate in Ann Arbor acquired by Alexander and Lena C. Wallace in the exchange, and the bank then filed a bill in aid of execution, alleging that the transaction was in fraud of creditors, and praying that the conveyance, in so far as it appertains to Lena C. Wallace, be set aside and declared void and any attempted joint tenancy be revoked and that plaintiff be authorized to proceed upon its writ of execution. After a full hearing the court below entered a decree granting the relief prayed for.

The above facts are practically undisputed, but there is a sharp conflict in the testimony in relation to certain facts sought to be established by the plaintiff in proof of fraud. The president of the plaintiff bank testified that in previous loans Mr. Wallace had always put up certain collateral—some notes that he held and sometimes gas bonds—and that he asked him for this collateral in connection with the $225 loan of June 24, 1915, but that Mr. Wallace then stated to him:

"Well now I cannot. I have disposed of those securities and I have taken this farm back in my own name, and I own this 270 acres in my own name absolutely, free and clear from incumbrance."

And that it was on the faith of that representation that he loaned the money without security. Mr. Wallace in his testimony made a direct and positive denial that he had ever made such a statement. There was also some conflicting testimony as to the value of the farm property and as to sales of other land in the vicinity bordering on the lake.

It is the contention of counsel for the plaintiff that by the transfer of the personal property and the transfer of the real estate a fraud was committed by the defendants, and that at the very moment that the transfer of the property was made to George Gallup, the tenancy by the entireties in the real estate in Livingston county was severed. That the purchase of the property in Ann Arbor with the proceeds of the farm and personal property created a new condition. While we are not prepared to approve this contention of counsel as made, we nevertheless are of the opinion that the result reached by the learned trial judge can be justified by authority.

In *Newlove* v. *Callaghan*, 86 Mich. 300, it is said:

"It does appear that, at the time of the purchase of this property, the defendant John Callaghan was in-

debted to complainant in the amount of this judgment, and that defendants jointly purchased this property, and jointly paid the sum of $1,850 therefor, and that the deed was made to them jointly. In the absence of any showing to the contrary, the defendant John Callaghan must be presumed to have paid one-half of the purchase price. * * *

"It would be a gross injustice to permit debtors to apply moneys which should be applied to the payment of their debts, to the creation of an estate which would be beyond the reach of their creditors. Had the entire estate been placed in the wife's name, there could have been no question but that the same would be regarded as fraudulent under the statute, and it is no less a fraud upon creditors because the title has been taken in the name of the defendants jointly. In other words, estates in entirety cannot be created at the expense of creditors, and held in fraud of the latter's right."

And in the opinion on the rehearing of the same case, it was said:

"According to the answer, the purpose of taking the title in the joint names of the defendants was that the survivor should take; but if any part of the consideration was paid by defendant John Callaghan, the effect was to place that part beyond the reach of process, and that operated as a fraud upon creditors. A denial of actual intent to defraud does not avoid the consequences of an act which is in effect a fraud."

In the present case, if the Livingston farm property had been exchanged for the Ann Arbor real estate as an even exchange, without the payment of any difference by the defendants in cash, especially if it had been a technical "exchange," there might be good ground for the argument that the estate by the entirety in the Ann Arbor property might properly be considered as a continuation of the estate by the entirety in the farm property, which had been lawfully acquired. In such a case there would have been no conversion into money, but one estate by the entirety would have been exchanged for another estate by the entirety.

But, however that may be, under the reasoning of the decision above quoted from, Alexander Wallace, while he was indebted to the plaintiff, had no right to tie up an additional sum, represented by one-half of $4,100, in an estate by the entirety and make no provision whatever for the payment of the few hundred dollars that he owed the bank, especially in view of the fact that by a simultaneous transaction he had disposed of all his personal property and taken in lieu thereof some worthless stock, thereby further hindering the plaintiff in the collection of its claim. It may be argued that no part of the $4,100 cash payment was furnished by Mr. Wallace, but that it was loaned by a third party, which reduced defendants' actual equity in the property to just the value of the farm property, and that this debt was to be paid out of the income of the Ann Arbor property, which, under an extension of the doctrine of *Dickey* v. *Converse,* 117 Mich. 449, might be said to partake of the nature of the realty; hence that no separate personal property of Mr. Wallace would ever be invested in the land. But the fact remains that, by means of this deal, $4,100, of which Mr. Wallace presumptively would contribute one-half, will be invested in an estate by the entirety, out of the reach of Mr. Wallace's creditors. Credit for $2,400 has already been given on this indebtedness for a five-year lease of one of the Ann Arbor houses, which increases defendants' equity by that amount. *Dickey* v. *Converse* applied only to crops grown on a farm held by entireties. Before increasing the amount of his investment in execution-proof property, it is defendant's duty to pay his debts. In the absence of any showing that Mrs. Wallace personally has or will furnish the $4,100, we see no reason why the bank should not be allowed to realize by execution out of the property an amount clearly not in excess of the proportion of the surplus of $4,100 which Alexander Wallace

may fairly be presumed to have contributed. No reason appears why, if the defendants are unable otherwise to pay this judgment and avoid a sale of the property, they cannot raise the amount by mortgage. It is not necessary to discuss the question whether the fraud was intentional. It is sufficient that the transaction was in effect a fraud on creditors.

Assuming, then, that the investment in the Ann Arbor properties represented by the value of the Livingston farm land still continues to retain the character of an estate by the entirety, nevertheless, as to the amount of money invested by the defendant Alexander Wallace in the Ann Arbor properties above the value of the Livingston farm we do not think, under the circumstances of this case, that he should have the right to create an estate by the entirety. At least to the extent of this amount the land should be subject to the claim of the plaintiff, and we are therefore of the opinion that a decree should be entered ordering a sale of such an interest in the Ann Arbor properties as represents one-half of the investment made therein in excess of the value of the Livingston farm property as established by the sale thereof.

A decree may be entered in accordance with this opinion, with costs to the plaintiff.

BIRD, MOORE, STEERE, BROOKE, FELLOWS, and STONE, JJ., concurred with KUHN, J.

OSTRANDER, C. J. I think it is obvious that the decree indicated by this opinion cannot be enforced in accordance with any known rules.